Sneed, J.,
delivered the opinion of the Court.
The plaintiff, a banking corporation in the city of 'Memphis, on the 20th of February, 1862, was the Folder of several promissory notes maturing after that date, upon which the defendants, a firm of merchants in said city, were endorsers. The plaintiff brought its several actions in ‘ the Circuit Court of Shelby county and had judgments upon said endorsements against the defendants, who appeal in error. The testimony in two of the three cases is slightly variant from that in the other—but all are embraced in the transcript, and the determination of each must depend upon the same principles of law. The defense relied upon by the defendants is, that the law has dischárged them from their contingent liability as endorsers, by reason of the laches of the plaintiff in making demand and giving notice of the dishonor of the paper. The plaintiff insists, on the other hand, that it was excused in law from making demand and giving notice at the maturity of the notes, by the circumstances of the existence of the late civil war and the incidents thereto herein-after stated—and that the demand made and notice *422 given as soon thereafter as could reasonably be, were,, in law, sufficient to charge the defendants as indorsers. The three notes fell due in the month of June, 1862,, after the v capture and occupation of the city of Memphis by the Federal forces — and after the assets of the-bank, including these notes, had been sent South within the Confederate lines by the order of the Confederate-authorities. As the three cases must turn upon the-correctness of the charge of the' Circuit Judge, which, was in each the same, we will only discuss the facts, of one of them — premising that each of the notes was payable at the plaintiff’s bank in Memphis and that each fell due in June, 1862, as stated, after the occupation of the city by the Federal army, and after the-assets of the bank had been removed under the aforesaid orders within the lines of the Confederate army.. This case presents the state of facts following: On the-20th of February, 1862, A. G. Neville executed his. note at four months for $2,804.84, payable to the order of Josephus Loving, at the Bank of West Tennessee at Memphis — which was endorsed by Loving to-F. Lane & Co., and by the latter to the bank. This note, it seems, was discounted by the bank and the proceeds placed to the credit of the defendants, the last endorsers. The note was not protested until June-7th, 1865, when the notary presented the note for payment at the old banking house of the plaintiff, where the note was made payable — and the note not being-paid, he protested and gave notice to defendants accordingly. During the period embraced between the-6th of June, 1862, when the Federal armies took pos-- *423 session of the city, and the time of the protest on the 7th of June, 1865, the defendants, F. Lane & Co., were residing in the city and doing business as merchants, and the maker of the note was either within the city or residing within a few hours journey thereof, and in the Federal lines. The declaration charges that he was in the city all the time. A quorum of the directors of the bank,, and a majority of the stockholders were also within the city at the time of the maturity of the note, and during the entire period of the war — and the President and Cashier occasionally there during the war and after the maturity — and transacting business for the bank. It is also shown, that after the occupation and during the period of the duration of the war, notaries public were daily in the discharge of their notarial functions in the city — and that banking was carried on by other hanks without interruption from the Federal authorities. The assets of the bank were removed under the orders of the Confederate authorities to Grenada/Miss., on the 27th of May, 1862 — the bank having had a month's notice by precautionary order that the Confederate authorities would require its removal upon the approach of the Federal army to occupy the city. The Cashier accompanied the assets South and retained the custody of the assets as Cashier, still salaried as such, until the close of the war. On the 15th of June, 1862, he was ordered to remove the assets still further South, and thereupon removed them via the city of Mobile to the city of Montgomery, and was upon the river approaching the latter city about the date of the ma *424 turity of thé noté sued. on, which he then had among the other assets of the bank. No descriptive list was left with any agent or director of the bank in Memphis, of any of the bills or notes, forty-five in number, maturing after the assets were removed. The defendants had done most of their business with the bank, and had long had a line of discounts there. The defendants, as was the custom of merchants, kept a book in their office in which was entered all bills receivable and payable. The notes sued on were among them. This general custom of merchants was known to the President and Cashier, and the latter states, that if at any time he should have been called upon for a description of these notes sued on, he would have referred the enquirer to the books of the defendants. The President of the bank went South on the 6th of June, 1862, and returned to the city in October, 1862. In the month of November, 1862, the Cashier, then at Athens, in the State of Georgia, transmitted through the lines to the President at Memphis, $50,000, in notes of the bank signed by the Cashier aud to be signed for issuance by the President — and which were accordingly so signed and invested by the President in Memphis, on account of the bank, in the bills of other southern banks. The Cashier states that he might at that time have as easily transmitted the notes now sued on, or copies thereof. The Cashier himself also came to Memphis in 1863 and 1864 on business of the bank, and states that he might then have brought the notes or copies. During the period intervening between the Federal *425 occupation and the close of the war, the bank through its directors, made divers collections, and among them the sum of $10,000 on account of discounted notes and stock subscriptions from these defendants, F. Lane & Co. And during that period the directors held one regular meeting for the transaction of business, and divers conferences between individual directors — but the banking house was not kept open by them — though it was occupied by others, and an agent of the bank was generally about it to protect the building, its fixtures and furniture. At one of these meetings of the board in 1863 or 1864, the Cashier submitted a balance sheet and report of the condition of the assets of the bank. In April, 1863, the President again went South and again returned to the city in 1864. About the close of the war he was in the South, and by a circuitous route accompanied the assets back to the city, where he arrived on the 6th of June, 1865. The notes were protested and the indorsers notified on the day following. The Cashier testifies that if the officers of the bank had applied to the defendants for a descriptive list of the notes they would have furnished it — but no such application was made. Under the by-laws of the bank, the President and Cashier had the general supervision of and over the affairs of the bank — and the board of directors were authorized to appoint a President and Cashier pro tempore, whenever the necessities of the bank demanded it. It appears in proof that Fletcher Lane, of the firm of F. Lane & Co., was himself a director and stockholder in the bank. It seems also that the directors and officers of the *426 bank, while the Southern troops held the country, had loaned large sums of money to the Generals of the Army and to the Governor of the State for military purposes — and that, as early as February, 1862, resolutions looking to the voluntary withdrawal of the assets South were adopted by the board of directors— and on the 22d of March following the depositors were notified of such purpose, and admonished to withdraw their deposits. From that date, which was prior to any precautionary order of the Confederate authorities, the bank seems to have been forecasting its plans and preparations to retreat to the South. It is upon this state of facts, that the plaintiff seeks to excuse a regular demand and notice, and to charge the defendants upon the demand and notice actually given after-the close of the war. The ground upon which the plaintiff proceeds is carefully and strongly stated in the words following in its declaration:
“At the time of the making and indorsement of the note a war was flagrant between the Confederate States and the United States, and at that time also-the makers and indorsers lived in Memphis, which was then in the Confederate lines; that between the time of the making and indorsing and the time of the maturity of the note, to-wit: on the 6th of June, 1862, the United States military forces conquered and permanently occupied Memphis, and so continued to the close of the war; at the maturity of the note Memphis was surrounded by military lines; that by law and military orders all intercourse between residents of tlip city and persons without said military lines, was *427 interdicted and unlawful; that before maturity, on the 28th of May, 1862, the Bank of West Tennessee and the Cashier and its Officers, with the assets, including-said notes, were by the military order, force and power of the Confederate States, forcibly and without their consent, removed and carried within the military lines-of the Confederate States; that the maker and endorser-remained in Memphis, and were there at the maturity of the note, and so continued until the close of the war; and that the bank, its officers and assets, including the note, were by the power, force and authority of the Confederate States, forcibly held and detained, without their consent, until the close of the war; so it was not lawful or possible for them to demand payment of said note of the maker, or give notice of non-payment to the endorser, during the continuance of the war, but within a reasonable time after-the interdiction of commerce was removed by the close of the war, to-wit: on the 6th day of June, 1865,. plaintiff caused the note to be presented for payment, and dishonored and due notice given.”
The court, upon this state of facts, after giving-the jury proper instructions as to the law governing-the question in ordinary cases, charged the jury as-follows: “ If at the time the note is due there is a war raging between the place where the holder is and the place where the endorser is, the making of demand and giving of notice is excused so long as the war lasted, but as soon- as the war closed it would be the duty of the holder to make the demand and give the notice as soon as a prudent and diligent business man *428 would, under like circumstances, give it, in a transaction of his own. That is, he must use reasonable ■diligence to give notice, and if he gave the notice with due diligence he bound the endorser. If when the note fell due, the defendants were in Memphis and the note was not — and Memphis was then in the military occupation and control of the United States military forces — and the place where the note was, was ■under the military control of the Confederate States, and there was a war raging between these two powers ■at the time, this would excuse the demand of payment ■and notice of non-payment to the indorsers, so long as the war lasted between these places, provided the note was absent from Memphis — not by the procurement of the plaintiffs, but was absent in obedience to the orders given by or under the authority of the military powers of the Confederate States, whether these ■orders were obeyed willingly or unwillingly — and if in this event demand of payment and notice of non-payment to defendants were given as soon after the war closed as a prudent business man would have made demand and given the notice under like circumstances this would bind the defendants.”
The charge of the court is generally if, indeed, not eritieally accurate, as applicable to the ordinary case of non-intercourse under the laws of war, where ■commerce and intercourse between the belligerents is not only interdicted but rendered impossible without incurring or hazarding the severe penalties of the laws ■of war. It is undoubtedly true that if the holder of negotiable paper be in the country of one belligerent *429 and the maker and endorsers in the country of' the adverse belligerent, and all intercourse is interdicted so that demand and notice at maturity be even impracticable without peril of liberty or life or ihe confiscation of the paper itself — then demand and notice is to be excused in law until this barrier is removed. But that is not this case; and the generality of the charge withdraws from the jury, as completely as if done in express and particular terms, the consideration of the peculiar facts which distinguish the defendants' case from that assumed by the court, and which in the law merchant, except it from the operation of the abstract rule.
It was an observation of Lord Denman, that Lord Mansfield never conferred upon the commercial world so great a benefit as by his decision in Tindal v. Brown, 1 Term R., 167, where his perseverance compelled them to submit to the doctrine of requiring “immediate notice." If all the facts of such notice be ascertained, and there be no conflict or doubt of fact, the question is one of law for the courts, whether the notice be reasonable or otherwise: 10 Mass., 84; 1 N. H., 140; 2 Harrison, 488; 6 Watts & Serg., 294; 2 Hay., 45; 2 Marsh, 610. If the injury involve a mixed question of law and fact, they are to be submitted to the jury under instructions as to the principles of law that are applicable. The truth of the facts must be determined by the jury — but the court must determine whether the facts so found by the jury to be true, are “sufficient in law to maintain the allegations of the pleadings:" Per McKinney, J., Whirley v. Whiteman, *430 1 Head, 617; Aymer v. Beers, 7 Cow., 710. The great value and wisdom of this “immediate notice” of Lord Mansfield, or in its absence, of this reasonable diligence of the law, is well illustrated in the facts of the case now in judgment, where the indorsers have made a contingent bargain with the holder to be bound for the maker, amply solvent at the date of the note, if the holder will exercise a reasonable diligence in demanding payment, after maturity, of the maker. These principles of the law merchant entered into the contract and became a part thereof — and if it turn out that the omission of the holder to do this thing, has wrought an injury to the endorsers by converting prima facie a conditional liability into an absolute one — then the law will very carefully scrutinize that omission, and if it amount to laches it will rebuke the wrong by discharging the endorser. It is said that in this case the maker was amply able to pay at maturity and long after; but three years after, when this demand was made, it found him impoverished.
The question is then, do the facts of the case, which are undisputed, excuse the demand at an earlier day than actually made? A grave argument is pressed upon us as to the effect of the laws of war upon the rights of these parties. It is insisted on behalf of the plaintiff that the interdict of commerce and intercourse between Memphis, where the maker and indorsers were, and the State of Alabama or Georgia, where the chief agent of the plaintiff was at the time of maturity, with the note in his possession, is an excuse for the delay of three years in the demand and notice. *431 'That the absence of the agent and assets of the hank was under the then lawful mandate of the Confederate Government, to which the plaintiff then owed its allegiance, and that the exercise in the city of any of the functions of a bank, pending the Federal occupation, even to the extent of the protestation of a dishonored note, would have been a violation of the spirit of the military order, and au unlawful breach of the plaintiff's allegiance. On the other hand, the court has been asked to pronounce the late civil war on the part of the Southern States a wrong, upon which no legal rights can be predicated in behalf of the plaintiffs, who gave it aid and comfort, and who withdrew themselves from the protection of the “rightful government,” and thereby forfeited its right to claim the protection of the law. We certainly do not assent to this latter view: — but we are of opinion that this controversy can be settled upon obvious principles of the law merchant, without the necessity of at all discussing those questions of grave debate, which however and wherever adjudicated thus near to the clash of arms in a civil war, cannot but be suspected of the partisan contagion, and cannot harmonize the distinct antagonism of opinion which must continue to exist in this country upon this subject. According to the common law' of England, natural allegiance was one thing, and local allegiance was another. The first was perpetual and the last was temporary, and both are founded upon the principle that allegiance is a debt due from the subject, upon an implied contract with, the prince that so long as the one affords protection, *432 the other will demean himself faithfully. Thus, says Sir William Blackstone, the prince is always under a constant tie to protect his natural born subjects at all times and in all countries, and for this reason their allegiance due to him is equally universal and permanent. But on the other hand, as the prince affords his protection to an alien only during his residence in the realm, the allegiance of the alien is confined in point of time to the duration of such residence, and in point of locality to the dominions of the British Empire. And Sir Mathew Hale has deduced the consequence, that though there be an usurper of the crown, yet it is treason for any subject while the usurper is in full possession of the sovereignty, to practice anything against his crown and dignity. And illustrations are given where though the true prince has regained his sovereignty, yet such attempts against the usurper, unless in defense of the rightful king, have been after-wards punished with death, because of the breach of that temporary allegiance due to him as king defactov Thus it is that after Edward the IV. recovered the crown, which had long been detained from his house by the line of Lancaster — treasons committed against Henry VI. were capitally punished, though Henry had been declared a usurper by Parliament: 1 Bl. Com., 285.
This principle of temporary allegiance has been applied with undoubted accuracy to the relation existing between the citizen and the respective belligerents in the late Civil War. And waiving all discussion of the grave questions made in the argument, we come to *433 consider the effect of this doctrine of temporary allegiance opon the rights of these parties. For whether the government of the late Confederate States was a government “ de facto, or a government of “paramount force ” it must be conceded that it was a temporary-nationality in arms, and had the physical power, if not the constitutional right, to enforce its laws within its-own dominion; and among its prerogatives was that of imposing a temporary allegiance upon all persons-within its borders. Whether a citizen had been expelled from the conquered territory by this nationality-in arms before its conquest, or voluntarily retreated before the approach of the conquering power, can make-no difference — the moment he voluntarily returned within the conquered territory he divested himself of his first allegiance and at once came under the latter— and for all the rights and purposes of citizenship, he was entitled to the protection of the conquering power. By his voluntary presence within the line's of the conqueror he was as completely divested of his former-allegiance as if it had never existed.
The circumstances which in the law merchant will excuse the demand and notice necessary to charge an-indorser, are such as amount in themselves to a dishonor of the paper by operation of law. They are-such as interpose a moral or physical impossibility to-make the demand with the exercise of that prudent and diligent fbrecaste and attention that a prudent man would use in relation to his own affairs, or the absence of all necessity for demand superinduced by the changed condition or relation of the parties. But *434 in whatever manner the dishonor is produced, the holder is in no case excused from giving reasonable notice thereof to the indorsers, if no good reason or impediment exist upon which the law will excuse notice. The books are full of examples and illustrations of what the law merchant recognizes as good ground to excuse demand in the one case, and notice in the other, but it is sufficient to state the general principle. 2 Greenl. Ev. Sec. 197; 1 Hare & Wall., Am. Leading cases, Ed. of 1871, 448. Story Prom. Notes, Sec. 257. “Thus,” says Judge Story, “the. object in all such cases is to require reasonable diligence on the part of the holder; and that diligence must be measured by the general convenience of the commercial world, and the practicability of accomplishing the end required by ordinary skill, caution, and effort. Due presentment must be interpreted, said Lord Ellensborough, to mean presented according to the custom of merchants, which necessarily implies an exception in favor of those unavoidable accidents which must prevent the party from doing it in regular time.” Story Prom. Notes, Sec. 259; Edwards on Bills, 159, 391. “Any thing, in short, that prevents the holder from taking the ’ necessary steps, and is not traceable to his neglect — to his “passive and contented negligence,” or inattention, will excuse delay so long as the preventing cause continues.” Edwards on Bills, 459. But the circumstances which excuse demand do not relieve the holder from giving due notice to the endorser, if like circumstances do not intervene to prevent that also. Chitty on Bills, 466; Landry v. *435 Stansbury, 10 La., 484; Edwards on Bills, 488, 489. The true question seems to be, in such cases, whether it was physically or morally impossible for the holder to present the note or bill for payment in due time. Edwards on Bills, 492, Schofield v. Bayard, 3 Wend., 488. But if the note or bill be lost, the presentment may be made on a copy, or by statement in writing describing the instrument; but this demand should be accompanied by a tender of indemnity. Edwards on Bills, 508. The loss of the instrument does not excuse the demand, for the maker may still be willing to pay on indemnity offered, or even without it, where he had a firm personal confidence in the integrity and high commercial solvency of the holder. Story on Prom. Notes, Sec. 244; Smith v. Rockwell, 2 Hill, N. Y., 482; Apperson v. Union Bank, 4 Col., 446. And mere personal knowledge by the indorser will not dispense with notice. Alton v. Robinson, 2 Hum., 341; Esdaile v. Sowerby, 11 East, 114; Burgh v. Legge, 5 Meeson and Welsby, 418; Gibbs v. Cannon, 9 Serg. and Rawl., 198. The fact that F. Lane, of the firm of F. Lane & Co., was himself a director in the bank, cannot effect the rights of the parties. His personal knowledge in the matter did not dispense with notice. He could not be trustee and debtor both. As to this debt he stood as a stranger to the bank. The by-laws forbade him from any action in regard to his own discounts; and, indeed, the proof shows that he was not one of the directors of the bank upon whom was thrown the management of its affairs during the Fed *436 eral military occupation of the city. And the excuse-of an impossibility which is not permanent, is only an, excuse for delay until the impossibility be removed. 1 Pars. Notes and Bills, 532, 507. That impossibility should excuse is obvious. The law compels no-one to do what he can not perform. But it must be actual and not merely hypothetical; and though it need not be absolute, no slight difficulty will have that effect. 1st Pars. Notes and Bills, 443. And it is not incumbent on the indorser to show the-holder where the maker is to be found, so that he may make a demand on the maker, when no application is made to him by the holder. Duncan v. McCullough, 4 Serg. and Rawl., 480. The law always presumes a detriment to the indorser if the holder has been guilty of laches. Ch. Bills, 435. And if the note be payable at a particular bank, and before the day of payment arrives that bank has no place of business, and ceases to exist, and another does business in the same room, it is sufficient to present the note for payment at their room. Central Bank v. Allen, 16 Maine, 41; Ch. Bills, 355. And if the note be lost, the loser must take care at the time it becomes due to observe precisely the same conduct as if he had it in possession. Ch. Bills, 271, 262. Though the assets of the bank had been forced out of the State by the military power, yet its corporate rights and franchise still remain, and these could not be expelled. The corporation itself could have no legal existence out of the boundaries of the Sovereignty by which it was created. Ang. *437 and Ames, on Corp., 250. If not forbidden by its charter it may, by comity of States, make contracts in other States; but the general franchises conferred by its charter can only be exercised within the State or government whose creature it is. 3 Head, 337; McCullough v. Moss, 5 Denio, 567. The cashier of a bank is generally its executive officer, by whom its debts are received and paid, and its securities taken and transferred. U. S. v. City Bank of Columbus, 21 How., 364. But it does not follow that he is the only officer of the bank whose duty it is to look after the securities of the bank, and to perfect and collect them. It is equally the duty of the President and Directors. “ In many species of corporations, it is. said, the position of director is almost a sinecure; the board only constitutes a sort of advisory body, which may meet on comparatively infrequent occasions to discuss questions touching the general business policy of the corporation. But it is not so with banks; their directors are bound to constant activity and thorough acquaintance with the daily course of affairs and dealings of the institution. They are not only bound to know what is done beyond the merest matter of daily routine, but they are likewise bound to know the system and rules for its doing. Morse on Banks, 91. They are trustees of the stockholders, and in the absence, illness, or negligence of the cashier, are bound to perform any duty which belongs to him, and it is their duty to see that the duty is performed. They are bound in law to know the securities of a bank, its bills payable and bills receivable, and the *438 maturity of its paper, and who are the parties. And; in the absence of the cashier they are bound to due diligence in perfecting the liability of all endorsers upon the paper of the bank.
We -come now to apply these obvious and familiar-principles to the case in judgment. The corporate life of the plaintiff had still an existence in this State during the period of the late civil war, which was. neither in abeyance nor paralyzed, so far- as the lawful exercise of its franchises were concerned; nor was its. corporate existence affected by the absence of its assets or the presence of the Federal army of occupation. The corporation could not have had a lawful existence elsewhere. The Directors who, in contemplation of law, were the corporation, had chosen 1o. remain within the Federal lines, and accept their protection. The maker and indorsers were there also, and a majority of the stockholders. Under the laws of Avar all these enjoyed the protection of the Federal forces, and were in no wise interrupted in the pursuit of their daily avocations. These Directors, then representing the corporation, were not effected by the vis major which had expelled the assets of the bank, and were guilty of no breach of allegiance to the-Confederates in any act they might have done in behalf of the bank. They had held business meetings they had collected of these defendants $10,000 in stock subscriptions and discounted notes; they had received a report and balance sheet, submitted to them by the Cashier, showing the state of the assets; they were-cognizant of the issuance and conversion by the Presi *439 dent of $50,000 of the notes of the bank into other bank paper within the federal lines-; they were within, a few' hundred yards of these defendants, who could have furnished them, on the 23d of June, 1862, with a description of the note in controversy. Other banking houses were carrying on their business daily, and notaries performing, their daily functions in protesting notes and notifying endorsers without interruption. It was not morally or physically impossible for them, or one of them, to have caused the due presentment of the note, and had due notice given. They had adopted a resolution as early as the 18th of February,. 1862, looking to the voluntary removal of the assets of the bank. It was their duty, then, to have-caused a descriptive list oí the notes to be prepared, and this they neglected to. do for more than three-months, and until a peremptory military order compelled them to send the assets away. This descriptive list might have been made after the peremptory-order, there being but forty-five notes coming to maturity afterward; but they failed to do so. The note was suffered to remain with a “passive and contented negligence” on the part of these gentlemen and the President and Cashier, during the whole period of the war, and though claimed to have been dishonored by operation of law, yet they failed for three years to-notify these defendants thereof. The law, in such case, recognizes no valid reason why the neglect- of the plaintiff should be excused. And even if the truth developed some peculiar circumstances surrounding these parties at the maturity of the note which *440 would excuse demand, then it became the duty of the plaintiff to give notice in a reasonable time to the defendants that the note had thus been dishonored by operation of law. The presence of the Directors, the maker and indorsers within the federal lines during the whole period, the occasional presence of the ‘Cashier and President, who might have as easily brought back the notes as to transmit back and forth the $50,000 of the bank notes, or the balance sheet, •and the absence of any manner of duress, or any military order which forbade the proceeding, discloses to our minds something more than a case of a mere want of due diligence. It is a ease of gross and inexcusable negligence which the law will not tolerate to make absolute the contingent contract of an indorser. The officers of the bank threw off their allegiance ■to the Confederate Government by residing and remaining Avithin the lines of the other belligerent; and Laving continued in the partial performance of the corporate functions there, they cannot now be heard to urge any considerations of broken faith with the Confederacy, as an excuse for their non-performance of other duties as the trustees of the corporation, equally obligatory upon them. . We have given to' this case that consideration which the important interests involved, and the earnestness and ability of the arguments presented seemed to demand, and we ■are all of opinion thatj under the undisputed facts stated, the laches of the officers of the bank must have the effect to discharge the endorsers. There may, however, be other facts which, upon another investí- *441 gation, may present the case in a different aspect. We only adjudge the case upon the facts before us, which, being undisputed, leaves but a question of law for our determination. 10 Mass., 84; 1 N. H., 140; 2 Harrison, 488; 6 Watts and Searg., 294; 2 Hay., 45; 2 Marsh., 610; Whirley v. Whiteman, 1 Head, 617; Aymer v. Beers, 7 Cow., 710.
Let the judgments in the three cases be reversed, and a new trial awarded.